IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTESANIAS HACIENDA REAL, S.A., | : | |
| | : | Civil No. |
| **Appellant,** | : | 23-cv-02406-KNS |
| | : | |
| | : | Adversary No. |
| v. | : | 17-028 |
| | : | |
| | : | Chapter 7 No. |
| IVAN L. JEFFERY, | : | 16-15037 |
| | : | |
| **Appellee.** | | |

**Scott, J.**                                                    **March 19, 2026**

**MEMORANDUM**

The instant case is an appeal by Appellant creditor Artesanias Hacienda Real, S.A. ("Artesanias") from the bankruptcy proceedings of Appellee debtor Ivan L. Jeffery ("Jeffery") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"). Artesanias appeals the June 8, 2023 Opinion and Order (the "Bankruptcy Opinion") of the Bankruptcy Court, which entered judgment in favor of Jeffery. Artesanias appeals the Bankruptcy Opinion on the following grounds: (1) Jeffery should have been denied discharge under 11 U.S.C. § 727(a)(4) because he falsely answered questions and omitted information in his bankruptcy filings; (2) Jeffery should have been denied discharge under 11 U.S.C. §§ 727(a)(2)(A) and (B) because he intended to hinder, delay, or defraud a creditor or an officer during the administration of the bankruptcy case; and (3) Jeffery should have been denied discharge under 11 U.S.C. § 523(a)(6) for his solicitation and acceptance of a bribery agreement that is in violation of his fiduciary duties and Pennsylvania criminal law. As set forth below, this Court affirms the Bankruptcy Court's Opinion.

1

I.      **BACKGROUND**

A. **The Underlying Facts.**[1]

Before filing his bankruptcy petition, the debtor, Ivan Jeffery, resided in Pennsylvania where he spent nearly fifty years working in the metal casing industry.  He and his wife frequently vacationed in Florida and intended to retire there.  In 2008, with the assistance of legal counsel, Jeffery and his wife created an estate plan that included the establishment of a revocable trust (the "WSJ Trust").  A.1167.  Jeffery and his wife initially funded the WSJ Trust with four parcels of Florida real estate; however, at the time of Jeffery's bankruptcy filing, the trust owned only three parcels.[2]  One of the parcels is the current residence of Jeffery and his wife.  A.415.  Another is a neighboring farm which Jeffery inherited from the estate of his father and where he currently grows oranges.  A.521-22; A.578-585; A.416.  The final parcel includes a mobile home that the Jefferys rent to a third party.  A.523-24; *see* A.418.

Jeffery acquired the metal casting company, Wilton Armetale, Inc. ("Wilton") in either 2010 or 2012, and served as its sole officer until July 2015.  A.2311.  Wilton became unprofitable in the spring of 2015, and shortly thereafter, the private equity firm North Mill Capital replaced M&T Bank as Wilton's lender.  A.806.  While serving as Wilton's CEO, Jeffery contributed $250,000 of his own money after North Mill was unwilling to provide additional funds.  A.807.  This agreement was called the Junior Participation Agreement ("JPA"), which subordinated the priority of Jeffery's lien to North Mill's lien.  A.2298; A.807.  In September 2015, Wilton stopped making its loan payments and North Mill declared it in default.  A.808.  Additionally, Wilton was

---

[1]      The Court's cites to the facts using the Appendix filed with Appellants' brief ("A").
[2]      The parcel referred to by the Bankruptcy Court in its opinion as the "second parcel" is 42630 Maggie Jones Road in Paisley, Florida. It was transferred by Jeffery and his wife to the WSJ Trust in 2008 and later transferred to Jeffery's sister.  A.754; *see* A.2016.

unable to pay its vendors, and in November 2015, Artesanias filed a lawsuit against Wilton seeking $900,000 for unpaid merchandise.

In February 2016, North Mill decided to liquidate Wilton and began soliciting bids from liquidators. A.802; A.827. On February 15, 2016, Wilton received a letter from the manufacturer Vagabond House suggesting a possible purchase price of $1.23 million. North Mill and Jeffery instead accepted a liquidation proposal from the investment firm Gordon Brothers, which was to pay $725,000 for Wilton's non-real estate assets. A.827; A.2398.

Because the proposed purchase price made it unlikely that Jeffery would recover any portion of the $250,000 he had previously contributed, North Mill grew concerned that he might not support an early liquidation of Wilton. To facilitate the transaction, North Mill proposed sharing the proceeds from Wilton's real estate with Jeffery on an 80/20 split. A.2304; *see* A.830. The JPA was amended to reflect the change, and Jeffery, in his capacity as CEO, consented to accept the proposal from Gordon Brothers. A.2463.

On April 7, 2016, Artesanias obtained a judgement of $923,000 against Jeffery. A.901; A.1149. Shortly after, North Mill confessed judgment against Jeffery. Jeffery's combined debt exceeded $2 million. In June 2016, Jeffery gave $10,000 to his brother, who had recently experienced a house fire and had not yet received any insurance proceeds. A.595.

### B. The Bankruptcy Proceeding

On July 15, 2016, Jeffery filed a Chapter 7 bankruptcy case, after his legal counsel advised him that Artesanias was likely to pursue collection of the $923,000 judgment entered against him. A.1002; A.2477. Jeffery's counsel prepared the petition, schedules of assets and income, and the Statement of Financial Affairs ("SoFA") based on documents that had been mailed to and

3

completed by him.  A.957-58.  At trial, counsel could not recall whether the documents were reviewed with Jeffery prior to filing.  A.959.

The Chapter 7 Trustee identified several deficiencies in Jeffery's schedules and the SoFA. Among other issues, these included omissions related to the orange farm and inconsistencies regarding the WSJ Trust.  The Trustee was aware of the WSJ Trust because it was discussed during the § 341 meetings of creditors and Jeffery listed payments to the trust in his SoFA.  A.461; A.464. However, Jeffery failed to list the individual properties owned by the WSJ Trust on his Schedule A/B.  Jeffery amended his Schedule I and SoFA once each, and his Schedule A/B twice.  A.430; A.1009; A.1016; A.1018.  The Bankruptcy Court noted that the Trustee continued the § 341 meeting multiple times over several months before administration of assets progressed.  A.66-67. The Trustee did not object to Jeffery's discharge, nor did she file a § 542 action to challenge the validity of the WSJ Trust, its ownership of the Florida properties, or the $10,000 payment Jeffery made to his brother.

On January 19, 2017, Artesanias filed an adversary proceeding against Jeffery, seeking a denial of discharge.  Counts I through III challenged Jeffery's entitlement to a discharge under 11 U.S.C. § 727: (a)(4)(A) (making a false oath), (a)(2)(A) (intentional concealment), and (a)(3) (concealment of records). Count IV sought dismissal for failure to comply with a request to produce tax returns.  Count V sought to except from Jeffery's discharge the $923,000 owed to Artesanias based on 11 U.S.C. § 523(a)(6).  On January 30, 2019, Jeffery filed a motion for summary judgment. On February 20, 2019, Artesanias filed a cross-motion for summary judgment and opposition to Jeffery's motion.  The Bankruptcy Court denied in part and granted in part Jeffery's motion on the three counts relating to objection of discharge under 11 U.S.C. § 727(a)(4),

11 U.S.C. §§ 727(a)(2)(A) and (B), and 11 U.S.C. § 523(a)(6).  A trial was held in Reading, PA from May 25-27, 2021 to adjudicate Artesanias' adversary proceeding against Jeffery.

At trial, Artesanias alleged that Jeffery made false statements and that his Voluntary Petition, Schedules, and SoFA included several omissions.  The Bankruptcy Court identified that there were several instances in which Jeffery had to know he was answering the forms incorrectly, namely, his failure to identify the orange business Jeffery operated and its assets, the Florida real estate included in the WSJ Trust, the interest in the Trust itself, and the $10,000 cash payment to his brother.  A.68-9.  The Bankruptcy Court observed that the majority of Jeffery's disclosure failures related to his planned retirement to Florida, a relocation that he and his wife had been planning for at least eight years when they initially created the WSJ Trust.  A.69-70.  Jeffery failed to disclose that he was operating an orange farm on property owned by the WSJ Trust, that the business was supported by vendors paid by Jeffery, and that the crop was irrigated by a satellite-operated system valued at nearly $200,000.  A.70.  He also did not disclose that he harvested and sold $20,000 worth of timber from a portion of the Trust property that was not suitable for farming. *Id.*

Even with such omissions and other misstatements in the Schedules and SoFA, the Bankruptcy Court found Jeffery's testimony at trial to be credible.

> Mr. Jeffrey did not appear to be evasive when answering Plaintiff's questions, nor did he deflect or become overtly defensive in his testimony. He admitted to making mistakes on the schedules and appeared to be straightforward and honest in describing the financial situation which preceded the filing of the bankruptcy case and the various complications that surrounded the failure of his business.

*Id.*  The Bankruptcy Court used documentary and testimonial evidence to determine the errors were due to oversight by Jeffery and poor advice by legal counsel.  As the Court put it,

> Moreover, his testimony at trial reveals an uncertainty as to what his exact interest in the Trust was.  Figuring out the details and ramifications of the Trust was

5

something that the Debtor left to his counsel.  This indicates that the Debtor relied in good faith on his counsel's advice.  This was, after all, the same legal counsel that had set up the Trust in the first place.

*Id.*

Although Jeffery may have failed to disclose all the property in the WSJ Trust on his SoFA, the Court noted that he did inform the Trustee about the WSJ Trust at the initial § 341 meeting on August 22, 2016.  A.70.  Regarding the orange farm, the Court determined the errors were oversights rather than intentional wrongdoing.  A.71.  While Jeffery did not disclose the farm business on his petition, Schedule A/B, or SoFA, the business was reported on his tax returns.  *Id.* The Court found Jeffery's testimony credible, indicating "[he] was not trying to hide anything" and did not consider the farm much of a business.  *Id.*

Concerning the timber harvesting, which yielded Jeffery $20,000, the Court concluded that this was not a nefarious transaction since the sale was not initiated by Jeffery and the proceeds were reported as taxable income consistent with IRS regulations.  A.74.  The Court noted, "[w]hat transpired does not look to me like deforestation for a profit, but more like husbandry."  *Id.*

Turning to Jeffery's role as CEO of Wilton, the Bankruptcy Court found that Jeffery's failure to disclose the JPA and its subsequent amendment did not amount to intent to conceal. A.75.  Jeffery testified that he believed he would not receive any funds from the liquidation of Wilton's assets, and his legal counsel estimated the best-case scenario to be $50,000 to $75,000. A.75-76.  The Court observed that "because he believed his chances of any recovery were speculative, his failure to disclose [wa]s understandable."  A.76.  Furthermore, the Court noted this was "another instance where counsel should have instructed the Debtor to disclose; like counsel's involvement in the creation of the Trust, the same counsel negotiated the First Amendment to the JPA."  *Id.*

6

The Bankruptcy Court also characterized the $10,000 payment from Jeffery to his brother as a charitable gift.  A.77.  The Court explained that "[t]here was no indication in the testimony that [Jeffery] was attempting to divest himself of assets just prior to the bankruptcy filing."  *Id.*  However, the Court acknowledged that the cash payment was arguably material in the sense that it could impede the proper administration of the bankruptcy case.  A.80.  It commented that "[t]he timing is certainly suspicious, and the amount is not significant," but the omission had no impact on the bankruptcy proceedings because the Trustee elected not to avoid and recover the transfer.  *Id.*

Finally, the Bankruptcy Court held that Jeffery's conduct with respect to the Gordon Brothers transaction and the amended JPA did not constitute a breach of fiduciary duty or commercial bribery and did not result in a willful and malicious injury to Artesanias.  A.85-91.  The record did not support a claim that Jeffery deliberately inflicted financial injury on Artesanias.  A.87.  Although the Court stated that Jeffery "was certainly wrong to improve his position at the expense of his fiduciary obligation to creditors," his actions lacked the malice necessary to bar discharge.  A.90.

By written Opinion dated June 8, 2023, the Bankruptcy Court entered judgment in favor of Jeffery on all three counts.  On June 21, 2023, Artesanias filed an appeal before this Court with respect to the June 8, 2023 Opinion and Order.  This Court has fully considered the submissions by the parties.

## II.    **STANDARD OF REVIEW**

When reviewing a bankruptcy court decision, a district court applies a different standard of review to questions of fact and questions of law.  A district court "applies a clearly erroneous standard to findings of fact, conducts plenary review of conclusions of law, and must break down

mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992).

Under the clearly erroneous standard, the appellate court must "accept the ultimate factual determination of the factfinder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000) (citation omitted). A district court sitting in review of a bankruptcy order "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). When findings are based on determinations regarding the credibility of a witness, Rule 52(a) demands even greater deference to the trial court's finding. *Id*. at 575.

## III.    <u>ANALYSIS</u>

Artesanias presents three issues on appeal. First, Artesanias contends that the Bankruptcy Court erred in granting Jeffery a discharge under 11 U.S.C. § 727(a)(4)(A) by disregarding Jeffery's attempt to conceal assets through a reckless indifference to the truth, as evidenced by false statements and material omissions in his bankruptcy filings. Second, Artesanias argues that Jeffery should also have been denied a discharge under 11 U.S.C. §§ 727(a)(2)(A) and (B) based on his demonstrated intent to hinder, delay, or defraud a creditor or an officer of the estate during the administration of the bankruptcy case. Finally, Appellant asserts that Jeffery's discharge should have been denied under 11 U.S.C. § 523(a)(6) due to his willful and malicious conduct toward Artesanias, including his solicitation and acceptance of a "bribery agreement." This Court addresses each issue in turn.

8

### A.  Count I – 11 U.S.C. § 727(a)(4)(A) False Oath or Account

Artesanias contends that the Bankruptcy Court erred in declining to deny Jeffery's discharge under 11 U.S.C. § 727(a)(4)(A), arguing that inaccuracies and omissions in Jeffery's Petition, Schedules, and Statement of Financial Affairs ("SOFA") demonstrate a reckless indifference to the truth amounting to fraudulent intent.  The Bankruptcy Court rejected that characterization after a three-day bench trial, finding that Jeffery lacked the requisite intent to deceive and that any inaccuracies were immaterial to the administration of the bankruptcy estate. Because the Bankruptcy Court did not make erroneous factual findings, the judgment is affirmed.

11 U.S.C. § 727(a)(4)(A) codifies the principle that discharge depends upon full and candid disclosure.  It sets forth the following:

(a)  The court shall grant a debtor a discharge, unless
(4)  the debtor knowingly and fraudulently, in or in connection with the case
(A) made a false oath or account.

To prevail, the party objecting to discharge must establish by a preponderance of the evidence that: "(1) the debtor made a false oath or statement, (2) the debtor knew the statement was false, (3) the debtor made the statement with the intent to deceive, and (4) the statement was material to the bankruptcy case." *In re Hatch*, 2009 WL 3208694, at *8 (Bankr. E.D. Pa. Sept. 30, 2009).  A statement is made knowingly if it is known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth.  *In re Young*, 576 B.R. 807, 815 (Bankr. E.D. Pa. 2017); *see also In re Clark*, 2018 WL 4940799, at *7 (Bankr. E.D. Pa. Oct. 10, 2018) ("reckless disregard for the accuracy of the oaths made in a bankruptcy case satisfies the scienter requirement under § 727(a)(4).").

After the moving party satisfies its initial burden of producing evidence of a false statement, the burden of production shifts to the debtor to provide a credible explanation.  *Meridian*

*Bank v. Alten*, 958 F.2d 1226, 1233 (3d Cir. 1992).  This framework is exacting by design.  § 727(a)(4)(A) does not deny discharge for careless drafting alone.  Rather, it targets conduct that undermines the integrity of the bankruptcy process by concealing information that the trustee and creditors are entitled to evaluate.  *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

1. *The Bankruptcy Court's Finding that Debor Did Not have Intent to Make False Disclosures was Not Clear Error.*

The question of intent is inherently fact-driven and depends in significant measure on credibility determinations and the surrounding factual context.  *In re Clark*, 2018 WL 4940799, at *7.  There is no dispute that Jeffery's Petition, Schedules, and SOFA constitute statements made under oath.  *See In re Young*, 576 B.R. at 815.  The Bankruptcy Court expressly acknowledged the identified inaccuracies and evaluated their significance.  It carefully catalogued multiple disclosure deficiencies, including omissions concerning certain business activities, real property held in the WSJ Trust, Jeffery's interest in the trust instrument, and a $10,000 prepetition transfer to his brother.  A.67-69.

The Bankruptcy Court nonetheless declined to treat the omissions as fraudulent.  After observing Jeffery's testimony and evaluating the evidentiary record, the Bankruptcy Court expressly found him credible.  Although the court identified four matters in which Debtor "had to know" his answers were incorrect—relating to the business and its assets, trust-held real estate, his interest in the WSJ Trust, and the $10,000 transfer—it ultimately concluded that those deficiencies did not demonstrate a fraudulent intent.  A.68-69.  The record reflects that Jeffery disclosed the existence of the WSJ Trust to the Trustee, produced tax returns and related trust documentation, and addressed these matters during multiple § 341 meetings.  A.78-80.  The Bankruptcy Court emphasized that Jeffery did not evade questioning, acknowledged mistakes in his filings, and provided consistent explanations concerning his finances and the Florida properties.  A.70-71, 78.

10

Jeffery further testified that he relied in good faith on counsel, who also assisted in creating the WSJ Trust, and expressed uncertainty regarding the precise nature of his interest in the Trust. A.78-79.  The Bankruptcy Court concluded that confusion in the filings stemmed largely from deficient attention by Jeffery's counsel rather than from a deliberate scheme to obscure assets. A.78-79.  The Court credited testimony that the petition and schedules were prepared by counsel and her paralegal, that the same firm advised Jeffery regarding the Trust, and that forms were sent by mail without certainty as to how Jeffery reviewed them.  Critically, the Trustee completed the process of identifying the extent of Jeffery's assets, and the Bankruptcy Court found no evidence that Jeffery sought to impede the Trustee or creditors' investigation.  A.79.

Under clear-error review, such credibility-based findings are entitled to substantial deference.  *Anderson v. Bessemer City*, 470 U.S. 564, 574–75 (1985) (a finding is not clearly erroneous if it is plausible in light of the record).  Where the Bankruptcy Court's account of the evidence is plausible when viewed in its entirety, a reviewing court may not reverse merely because it might have weighed the evidence differently or drawn competing inferences.  Therefore, the Bankruptcy Court's determination that Jeffrey lacked intent to provide false oaths under § 727(a)(4)(A) was not clear error.

2.  *Although the Bankruptcy Court Did Not Consider Intent Under the Reckless Indifference to the Truth Standard, it Nonetheless Determined that Jeffery's Disclosure Failures Were Immaterial.*

Artesanias argues that the Bankruptcy Court, as a matter of law, failed to deny discharge to Jeffery because it did not consider whether Jeffery made false disclosures with "reckless indifference to the truth," which is sufficient to constitute the requisite intent.  ECF No. 6 at 14-17 [hereinafter Appellant Br.].  It is true that the Bankruptcy Court did not expressly consider whether Jeffrey's disclosure failures qualified as reckless indifference to the truth, which if answered in the

11

affirmative would have satisfied the scienter requirement under § 727(a)(4)(A). *See Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 257 (3d Cir. 1995) (finding an abuse of discretion "if the [bankruptcy] judge fails to apply the proper legal standard.").

However, the Bankruptcy Court also determined that Jeffery's failures to disclose were not material. Materiality is an independent element under § 727(a)(4)(A) separate and apart from the intent element. A false oath is material if it bears a relationship to the debtor's estate or business transactions so as to impact the administration of the estate. *See In re Spitko*, 357 B.R. 272, 312-13 (Bankr. E.D. Pa. 2006); *In re Mannion*, 629 B.R. 783, 787 (Bankr. E.D. Pa. 2021). The Bankruptcy Court found that the Trustee was aware of Debtor's assets and transfers before discharge and that administration of the estate was not impeded. A.79-80. Although the $10,000 gift to Debtor's brother was identified as "arguably" material, the Trustee elected not to pursue avoidance. A.80. The Trustee investigated the Trust, the Florida properties, and the farming activity, and nevertheless proceeded with administration fully informed of the matters Artesanias emphasizes. On these facts, the Bankruptcy Court concluded that the misstatements and omissions did not materially impair the Trustee's ability to evaluate or administer the estate.

Artesanias fills many pages arguing that the WSJ Trust is a "sham trust" under Pennsylvania law and should have been disclosed under 11 U.S.C. § 541(c)(2).[3] Appellant Br. at 17-24. Artesanias goes on to describe many other of Jeffery's false statements and disclosure failures as evidence of his reckless indifference to the truth. Appellant Br. at 24-33. But absent

---

[3]   Even assuming that the WSJ Trust was not enforceable under Pennsylvania law and thereby subject to disclosure under the bankruptcy code, Artesanias does not explain how Jeffery's nondisclosure—even if done with a reckless indifference to the truth—was material. The Trustee was aware of the WSJ Trust. *See* Bankruptcy Opinion at 29 ("[W]hile numerous things about the Trust went undisclosed, it is unclear what appreciable effect this had on the administration of the case.").

from its lengthy discussion of Jeffery's reckless indifference to the truth is a responsive argument to the Bankrupcty Court's finding on materiality. Artesanias purports that so long as a false oath "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property," then such false statement or omission is material. *In re Raftogianis*, No. ADV 11-0315, 2012 WL 2885469, at *6 (Bankr. E.D. Pa. July 13, 2012); ECF No. 9 at 17-18. Artesanias posits that even omissions of small value assets can be material. *In re Lybrook*, 544 B.R. 537, 548 (Bankr. W.D. Pa. 2015). Artesanias fails to note, though, that "[m]ateriality may turn on the degree to which, if any, that the misstatement (or omission) impeded the proper administration of the bankruptcy case." *In re Mannion*, 629 B.R. 783 (Bankr. E.D. Pa. 2021). Artesanias only asserts that Jeffery's omissions related to the estate and property, but it did not elucidate how the omissions actually impacted the trustee's administration of the estate.

Therefore, even though the Bankruptcy Court did not explicitly assess whether Jeffery's disclosure failures constituted reckless indifference to the truth, the Court found a lack of materiality—which is an independent and necessary element of § 727(a)(4)(A). The Court finds no reversible legal error with respect to that determination.

## B. Count II – 11 U.S.C. §§ 727(a)(2)(A) and (B)

Artesanias next challenges the Bankruptcy Court's refusal to deny discharge under §§ 727(a)(2)(A) and (B), which preclude discharge where a debtor, acting with intent to hinder, delay, or defraud a creditor, transfers or conceals property within one year before filing or conceals property of the estate thereafter.

The Third Circuit has made clear that § 727(a)(2) requires proof of both a qualifying act—such as a transfer or concealment of property—and actual, subjective intent to hinder, delay, or

13

defraud. *Rosen v. Bezner*, 996 F.2d 1527, 1532–33 (3d Cir. 1993). Constructive fraud, negligence, or poor judgment will not suffice. *In re Hadad*, 2008 WL 2156354, at *2 (Bankr. E.D. Pa. May 21, 2008). Because direct evidence of intent is uncommon, courts may rely on circumstantial evidence, including "badges of fraud," such as transfers to insiders, timing in relation to creditor pressure, retention of control, lack of consideration, or concealment. *In re Lybrook*, 544 B.R. 537, 550 (Bankr. W.D. Pa. 2015). Although such badges may support an inference of fraudulent intent, they do not mandate one. *Id.* The controlling inquiry remains whether the debtor possessed the intent to hinder, delay, or defraud creditors. *Id.* at 1531–32.

The intent inquiry under § 727(a)(2) substantially overlaps with the intent inquiry under § 727(a)(4)(A). Having determined under Count I that Jeffery did not act with fraudulent intent, the Bankruptcy Court concluded that the same evidentiary record failed to establish that Jeffery had actual intent required under § 727(a)(2). Artesanias argues that the Bankruptcy Court's findings on intent for § 727(a)(4)(A) are erroneous for the same reasons that its findings for § 727(a)(2) are erroneous. Appellant Br. at 34-35 (listing six purported violations of § 727(a)(2)). The Bankruptcy Court acknowledged the suspicious timing and insider relationships, weighed the explanatory testimony, and considered the Trustee's investigation, and ultimately made a credibility determination that Jeffery did not act with the intent to hinder, delay, or defraud creditors. Where two permissible views of the evidence exist, the Bankruptcy Court's choice between them must stand. *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). Therefore, because the Bankruptcy Court did not commit clear error when it determined that Jeffery did not have the requisite intent for § 727(a)(4)(A), it also did not commit clear error when it determined the same for § 727(a)(2).

14

### C.  Count V – 11 U.S.C. § 523(a)(6)

Artesanias contends that Jeffery's conduct during the liquidation of Wilton renders its claim nondischargeable under 11 U.S.C. § 523(a)(6).  The Bankruptcy Court concluded that Jeffery did not act willfully or maliciously when liquidating Wilton.

§ 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  The U.S. Supreme Court has made clear that "willful" modifies "injury," not merely the act leading to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998).  A debtor must therefore intend the injury itself, not simply engage in conduct that results in economic harm.  *Id*.  The Third Circuit has articulated this requirement to demand proof that the debtor either had a subjective intent to cause injury or believed that injury was substantially certain to result.  *In re Conte*, 33 F.3d 303, 305–06 (3d Cir. 1994).  Malice, while not requiring personal animus, requires a conscious wrongful act undertaken without just cause or excuse.  *Id.*  The relevant inquiry is therefore not whether Jeffery participated in a liquidation that proved disadvantageous to Artesanias, but whether he intended to injure Artesanias or knew that injury was substantially certain to occur.

Artesanias argues that Jeffery's conduct regarding Wilton's liquidation constituted a breach of fiduciary duty and criminal bribery, thereby satisfying the intent and malice requirements under § 523(a)(6) as a matter of law.[4]  *Id*. at 43.  Jeffery did not pursue the Vagabond $1,232,000 proposal, but rather he agreed to approve the sale of all of Wilton's non-real estate assets to Gordon Brothers for $725,000 and to amend the JPA.  Appellant Br. at 39.  The amendment permitted Jeffery to receive 20% of net proceeds of sale of Wilton's real estate, whereas the original agreement

---

[4]    Artesanias also argues that the Bankruptcy Court committed reversible error by holding that Gordon Brothers was the only bidder on Wilton.  Appellant Br. at 43.  This basis for reversal is clearly refuted by the Bankruptcy Court's Opinion.  *See* Bankruptcy Opinion at 36-37.

subordinated Jeffery's $250,000 lien to full payment of North Mill's lien on Wilton's real estate. *Id*.

However, the Bankruptcy Court found that "the determinative factor in choosing [Gordon Brothers over Vagabond House] was the lender's increasing loan balance." Bankruptcy Opinion at 36. Because North Mill was funding Wilton's current expenses, "it needed to move fast to stop its growing losses." *Id*. at 37. Moreover, Gordon Brothers' $725,000 offer was a lump sum without conditions; on the other hand, Vagabond's proposal "contained so many variables that it was not clear what the net proceeds would be [from the sale]." *Id*. The Court found that North Mill was unsure if Jeffery would cooperate as CEO, so it offered to share the proceeds from the sale of Wilton's real estate sale. *Id*. Moreover, the Bankruptcy Court found that Jeffery was in fact pressured by North Mills to consent to the Gordon Brothers offer. *Id*. at 36; A.2407 (lender expressing preference for faster-closing purchaser). Although the Bankruptcy Court noted that Jeffery likely breached his fiduciary duty, this was not determinative of intent. Bankruptcy Opinion at 37-38. § 523(a)(6) requires more than proof of self-interest or conflicted decision-making.

The Bankruptcy Court observed live testimony, evaluated documentary evidence, and rejected a factual finding that Jeffery acted with willful and malicious intent. Findings of fact must not be set aside unless clearly erroneous, and due regard must be given to the Bankruptcy Court's judgment of witness credibility. Clear-error review does not permit this Court to reweigh the evidence or substitute its judgment for that of the trier of fact where the factual findings are not clearly erroneous. Considering the documented facts and the Bankruptcy Court's credibility determinations, its conclusion that Jeffery did not possess the requisite willfulness and malice required under § 523(a)(6) is affirmed.

## IV.     <u>CONCLUSION</u>

For the above-mentioned reasons, this Court affirms the Bankruptcy Court's judgment.